

**Stephanie Bono, JD, PhD**
**Licensed Psychologist**
**Horizon Therapy & Assessment Services**
5151 Mattis Rd., Ste. B, St. Louis, MO 63128
P: 314-252-8949 | F: 314-228-0833
stephanie@horizontas.org | www.horizontas.org

| | |
|---|---|
| **Name:** | **Kyle Gipson** |
| **Birth Date:** | **12/22/2000** |
| **Exam Date:** | **11/04/2023** |
| **Exam Procedure:** | **Clinical Interview with Kyle Gipson  (11/4/2023)** |
| | **Kaufman Brief Intelligence Scale – 2R (11/4/2023)** |
| | **Personality Assessment Inventory (PAI) (11/4/2023)** |
| | **Wellness Assessment (11/4/2023)** |
| | **Adverse Childhood Experience (ACE) Questionnaire (11/4/2023)** |
| | **Child Pornography Offender Risk Tool (12/1/2023)** |
| | **Static-99R (12/3/2023)** |
| | **Review of records: (11/1/2023) 12/1/2023)** |

**REFERRAL:**
Kyle Gipson is a 23-year-old single, White, heterosexual, cisgender man. He currently lives alone in his home in rural Worden, Illinois. He was referred for evaluation by his attorney, Joseph Flees, who is representing him on federal charges of Production of Child Pornography. A psychological and psychosexual evaluation was requested to assess Mr. Gipson's mental health and risk of future sexual violence. This report is strictly confidential and released only to the attorneys representing the defendant unless it is entered into evidence at a sentencing hearing. The defendant has been informed that he will not receive the report but may review the report to assist his attorneys in representing him.

**QUALIFICATIONS OF THE EXAMINER:**
Dr. Stephanie Bono is a psychologist, licensed in the state of Missouri since November of 2019. Dr. Bono obtained the Doctor of Philosophy degree (PhD) in counseling psychology from the University of North Dakota in August of 2019. She obtained her Juris Doctorate (JD) from the University of North Dakota in May of 2018. Dr. Bono practices at 5151 Mattis Road, Suite B, in St. Louis County, Missouri. Dr. Bono has provided assessment and treatment to individuals who have committed sexual offenses both pre-sentence and post-sentence.

**HISTORY OF PRESENTING CONCERN:**
Mr. Gipson stated that in January of 2022, he was arrested and charged by the State of Missouri with Possession of Child Pornography. After he was released, he did not search for, view, or download child sexual exploitative material ("CSEM") until his girlfriend, Monica, ended their relationship in September of 2022. Mr. Gipson stated that at that time, he became significantly depressed. He began smoking marijuana heavily and once again began to engage with CSEM. He said that initially he was anxious because nothing was happening with the state case. Over time, he felt almost invincible, as there was no information on casenet. He thought nothing was going to come of the matter and delved deeper into pornography. Mr. Gipson reported he came

across individuals online who were sponsoring the production of CSEM. He said they were very convincing in their narrative that what they were doing was "cool," and there was nothing wrong with it. Mr. Gipson shared part of the allure was being a part of something, and having the opportunity to gain power within that community. He stated that ultimately, he wanted to feel connected, and having some sort of "power" in the group equated to security. He recalled intense feelings of loneliness and unrequited romantic feelings for Monica. Mr. Gipson estimated that his production of CSEM began around February of 2023. He recalled that the first time he took any photos he felt disoriented and did not like it. He deleted everything off his phone after it was posted, as he did not want to hurt anyone, especially his daughter. However, when he got back online, individuals from the chat room began to contact him and asked him for more. Mr. Gipson shared he smoked marijuana heavily before he produced more material, as it lowered his inhibition and made it slightly easier. He stated that when he took photos, he never spoke to his daughter - he simply took a picture and sent it. He reported no coercion or grooming behavior and said he posted material on a few different occasions. He stated he was using social media sites such as Wickr and Telegram to chat with others and share CSM. He indicated he began communicating with an individual who turned out to be an undercover FBI agent. Mr. Gipson said he told the agent he had a 2-year-old daughter that he inappropriately touched. Mr. Gipson noted that he never touched his daughter inappropriately, but he told others online that he did because it seemed like that is what they wanted to hear. Mr. Gipson sent the agent a picture of his daughter in a car seat and said he had rubbed his penis against her genitalia. He then sent images to the agent depicting his daughter's vagina and anus. In March of 2023, Mr. Gipson was arrested again on federal charges of Production of Child Pornography.

Mr. Gipson shared he has a long history of online pornography use. He got a computer when he was 11 or 12 years old and said his friends across the street told him about pornography and showed him how to find it. Mr. Gipson said he wanted to view people his own age, so he began looking for CSEM. He recalled he wanted to identify what was happening for him at the time, as he was going through puberty and was curious about his developing sexuality. He used a site called Omegle and began chatting with others online. He stated he presented himself as he was online and openly shared his age. Regardless, several people chatted with him in a sexual manner. He does not recall sending pictures of himself to people he spoke with online.

As he got older, he said he continued to look for pornography depicting individuals around his age. He noted that when he was 16, he looked for 16 year olds. This led to having a large library of downloaded material with a wide age range of victims, from pre-pubescent to adolescent. After he turned 18, he was "on and off" with pornography for a while due to being preoccupied with other things in life. However, when he was down or stressed, he watched pornography and used it as a coping mechanism. After he left college and moved home, he began watching pornography more regularly and acknowledged he would occasionally search for CSEM.

Mr. Gipson shared it is difficult to think about searching for any type of pornography at this time, as he now has a clearer perspective of his addiction. He explained pornography was an intrusive, habitual thought that developed in childhood. After his first arrest, he told his family and Monica about his pornography addiction. He also told Monica about his own history of sexual abuse, which was perpetrated by his stepbrother. He noted he and Monica talked about his need to attend therapy, and Monica said he "had" to do it. However, Mr. Gipson shared that financial

issues came up, and while he tried to find a therapist, he was also very anxious about it. He looked at BetterHelp, though his father did not want to pay for it, so it was pushed off again. Mr. Gipson stated he has not had access to treatment since he has been incarcerated. He has a group of friends in the correctional facility that talk about it openly and provide support. He said he is excited to do therapy in the future and hopes he can get what he needs when he is sent to prison. Mr. Gipson stated that for now, he and his friends discuss their feelings, talk about the leadup to their decisions, and talk about what they will do when they get out.

## BACKGROUND AND SOCIAL HISTORY:

**Education:**
Mr. Gipson graduated from Northwest High School in 2019. He attended elementary and middle school in the Northwest School District as well, aside from attending Kaiser Elementary in Kirkwood his 1st and 2nd grade years. Mr. Gipson reported no academic difficulties and stated he was an "A" student. He was always focused on doing well academically. He stated he never got into trouble and had perfect attendance. Mr. Gipson shared he got along well with his peers and teachers. He participated in extracurricular activities or groups related to robotics, choir, theater, engineering, trivia, slam poetry, and other performing arts. After high school, Mr. Gipson attended Webster University for one year, where he majored in computer science. During his second semester at college, the COVID-19 pandemic began, and he was forced to move out of his dorm room. He returned home to his mother's house, where his girlfriend, Monica, was also living at the time. He stated he left college after the first year because Monica found out she was pregnant, and he believed his priorities needed to change.

**Employment:**
Mr. Gipson last worked at Walker Products in Pacific, Missouri. He began working at the company in September of 2022 performing data analysis. He said he really enjoyed his job and was working on several big projects, including one he developed on his own. He got along well with his coworkers and supervisors and noted they went out for happy hour together on Fridays. Mr. Gipson stated he worked at Walker until the time of his arrest and has not heard from anyone at the company since he has been incarcerated. Prior to his job at Walker, he briefly worked at an AT&T sales company. Before that, he was at Dema Engineering, where he worked for a year-and-a-half. He reported no history of missing work or tardiness and said he has never been formally reprimanded at any job. He has never sued an employer and has never been accused of sexual harassment.

**Medical History:**
Mr. Gipson reported no known developmental delays as a child. He was diagnosed with Ankylosing Spondylitis, which is a genetic form of arthritis that runs in his family. He reported a history of back pain, and he took Tramadol for relief. However, he became reliant upon the medication and eventually weaned himself off of it. He stated he now takes Ibuprofen to manage his pain. He had one minor surgery on his foot as a child. Mr. Gipson stated he has never lost consciousness due to accident or injury, though he passed out twice in middle school. He attributed this to feeling a high amount of anxiety.

**Psychiatric History:**

Mr. Gipson shared he has experienced symptoms of anxiety for some time. He noted some of his triggers include not being able to plan things in advance, ambiguous plans, and sudden changes to his schedule or routine. However, he stated he feels relieved at times when his plans change, as he does not have to follow through with something that might feel taxing. Other times, he does what he can to manage his emotions and adjust. He reported no history of psychotherapy and has never taken psychotropic medication. He has never been hospitalized for psychiatric concerns and has never experienced homicidal ideation. He has also never engaged in non-suicidal self-injury. Mr. Gipson stated he briefly thought about ending his life in middle school. He explained he was "not feeling well" and vented to a friend that he "wanted things to stop." He stated he does not recall what he meant by saying he wanted it to stop, but shared his belief he might have been overstressed at the time and wanted to stop feeling that way. In terms of family history of psychiatric concerns, Mr. Gipson shared that his mother and maternal grandmother both had anxiety and depression.

**Substance Use History:**
Mr. Gipson stated he did not start consuming alcohol until September of 2022, when he began going out with coworkers on Fridays. He estimated having about 3 drinks on each occasion. He vaped frequently in the past, though he realized it was not healthy and quit on his own in November of 2022. Since being incarcerated, he has used nicotine pouches on occasion. Mr. Gipson shared he began using marijuana in August of 2022 when he and his fiance smoked every few months when they were away from their daughter. However, when he was alone, he smoked more frequently. He acknowledged he first smoked marijuana at the age of 16, though he did not like it at that time. He reported no other substance use.

**Childhood and Adolescent Conduct History:**
Mr. Gipson stated he has no history of school suspensions, expulsions, or truancy. His history is negative for major conduct concerns such as stealing, shoplifting, running away, or Juvenile Court involvement. There are no common precursors to adult antisocial behavior, such as bed-wetting, fire-setting, or cruelty to animals.

**Adult Legal History:**
Mr. Gipson was arrested in January of 2022 for possession of child pornography. He has no history of other criminal charges. He has received one speeding ticket in the past and has never received a DUI. He has never sued anyone civilly and has never been sued. He has never filed bankruptcy and has no major consumer debt.

**Family Background:**
Mr. Gipson was born and raised in St. Louis. His biological parents separated prior to his 1st birthday. His mother, who was a teacher, never remarried or had other children. His father, who worked in IT, married a woman who had a son from a prior relationship. Mr. Gipson shared he "bounced back and forth" between houses but was mostly with his father every other weekend. He said that because it was just him and his mother at her house, it felt as if they were a team of two against the world. He had a group of friends nearby that he spent time with while at his mother's home. He said they played outside together, though once he got an Xbox one summer, they played a lot of video games together. Mr. Gipson shared that his experience at his father's house was much different. He described his stepmother as "always passive, in the background."

4

He explained she wanted his father to parent him and did not want to step in much. She had her own son, who was older than Mr. Gipson, though he could not recall exactly how much older he was. Mr. Gipson reported his stepbrother physically, emotionally, and sexually abused him for years, and the abuse was never addressed. Mr. Gipson explained the sexual abuse went undetected, though when he told his father about his stepbrother emotionally or physically harming him, it was dismissed. Mr. Gipson said he eventually kept quiet about all of the abuse he experienced due to his stepbrother's threats. He did not recall how old he was when the abuse started, though he recalled a memory from living in a townhome wherein his brother made him take off his pants so that he could stare at and touch his genitalia. Mr. Gipson reported he has memory gaps and usually remembers when things might have happened based on cues, such as where he was living at the time. He recalled living at the townhome when he was "fairly young" and estimated he may have been 5 years old. Mr. Gipson stated that he began dating a girl named Molly when he was 13 He said he was having a difficult time and was frustrated and having mood swings at one point, and Molly became concerned. He opened up to her and told her about the abuse, and while he wanted his mother to know, he could not be the one to tell her. He asked Molly to talk with his mother, and she did. He recalled his family was taken aback by the information, and he was instantly separated from his stepbrother. He explained he stayed at his mother's house and his father would visit him or take him places when he could. Mr. Gipson stated the abuse was never reported, and he never went to therapy to address the event. He noted his family told him that if he wanted therapy they would send him, though he said life went on and the abuse seemed to fade away. He said he was fine with his father coming to see him, but while they remained close, it did drive a wedge between them. His father introduced him to video games and Blues hockey, and he enjoyed seeing the fun side of him when he could. Mr. Gipson reported his brother was excluded from larger family events and he never had contact with his brother after that. However, he did attend his brother's wedding in November of 2022. He noted his brother was diagnosed shortly after with cancer, and he does not know where his brother currently lives or the status of his health.

Mr. Gipson stated he does not know much about how his father and stepmother handled the abuse, though he believes his brother was scolded. He shared that looking back, he realizes that it could have been handled better, and that therapy likely would have been helpful. He said he "bounces back and forth" about what should have happened with his brother. He explained that at times, he has been angry, spiteful, and hoped something bad would happen to his stepbrother. At other times, he understands that it might have been a mistake. Mr. Gipson shared his belief he was also emotionally abused by his brother, and while he did speak up, his father and stepmother did not believe him. Mr. Gipson recalled a time his stepbrother pulled his pants down, peed in them, and told him, "Ha ha, you peed your pants." He stated that from an outsider's perspective, he would think he was neglected. However, he does not feel that way, and believes he had a good upbringing. He noted he has good parents who brought him up with compassion and who valued academics. He said he cannot be angry with his parents too much, as it was not their fault. Mr. Gipson remains close with his parents. He stated his mother is helping to care for his daughter while he is incarcerated, so they cannot talk as much as he would like. He does speak to his father every day. He shared that much of his immediate family knows about his charges, including both sets of his grandparents. He stated his family is supportive of him and there is no animosity present.

5

**Trauma History:**
Mr. Gipson shared some details regarding the abuse he experienced from his stepbrother. He said his brother's behaviors worsened over time. He explained that when his father lived in Kirkwood, his brother attempted to "do things," but did not. When they moved to an apartment, his brother wanted to do more. He began to threaten Mr. Gipson and told him that he would harm his mother if he did not do what he wanted him to do. Mr. Gipson recalled that he told someone about his stepbrother threatening his mother, and indicated it may have been his father. He said the response was "That is weird, why are you saying that?" After elementary school, his stepbrother forced himself onto him and tried to perform "certain things." Mr. Gipson stated his brother told him to imagine it was whomever he had a crush on, and that he would not remember the incident. He stated his brother used manipulation to send a clear message of "we don't talk about this."

**Marital/Relationship History:**
Mr. Gipson stated the first girl he was interested in growing up was Molly, whom he began dating at the age of 13. He recalled that his mother was depressed around that time, and Molly's parents were having a bonfire. He wanted his mother to go with him as a means of connecting to others and making friends, but he also wanted to have a way to spend time with Molly. He reported their relationship ended in 2015, when Molly's family moved and she attended another high school. He then briefly dated a girl named Haley, whom he played soccer with. He noted their relationship was sexual, and while they used protection, when he tried to end their relationship she said she was pregnant. She was not pregnant, and he described her as fairly controlling overall. He then dated a girl named Addie when he was 16. He shared that their relationship lasted for over two years, though she was more mature than he was, despite them both being 16. He explained that she had a job and had money and independence, while he was academically focused. He reconnected with Monica, whom he had met in elementary school, during his senior year of high school. Mr. Gipson said they became close in French class, and while they had both recently broken up with their significant others, they decided to go on a "test date." Things progressed from there. He stated his relationship with Monica was great for the most part, though they had a couple of screaming matches while he was in college and living in the dorm. He shared that she was living with his mother and was upset that he was not at home and went to class and played video games. Mr. Gipson said they were able to work through any differences they had successfully, though their relationship ended harshly. He shared that after his State charges of possession of child pornography, he told her everything that led up to it. He said she was understanding at first and wanted to get him help. However, six months later, her attitude shifted to "You've done terrible things" and she distanced herself. In September of 2022, Mr. Gipson reported that Monica told him that she loved him but was not in love with him, and that while they had a life together, she could not stay with him. He said that he did not take it well and was emotionally stunned. He allowed Monica to continue living with him in his home initially, despite feedback from his best friend that it was not a good idea. Mr. Gipson said he allowed her to keep living in the home because he cared about her, though she did move out in October of 2022. He stated that when she did end up leaving, it was "surreal." He explained the house felt very empty, and he began using substances to cope.

**Social Support:**

Mr. Gipson reported he has always had friends growing up and noted that while he had different friend groups, there was cohesiveness. He explained that he likes to bring different people together and was able to mesh his friend groups well. After high school, many of his friends separated, though they stayed connected during the pandemic by texting. After Monica became pregnant, Mr. Gipson stated he was in denial and somewhat dissociated. He noted he would tell Monica that she just skipped her period. He did not accept the pregnancy until his father had a serious conversation with him and told him it was real and that he needed to step up. Mr. Gipson said he withdrew from his friends, and after his daughter was born, he was really only friends with one person, Hunter. He noted that he and Monica sometimes spent time with her friend and her boyfriend, as well. Mr. Gipson stated that Hunter moved in with him prior to his arrest and that things were going well. However, Hunter was home when Mr. Gipson was arrested and they have not spoken since. Mr. Gipson stated Hunter works with his mother, and his mother told him that Hunter is "very angry."

**PSYCHOSEXUAL HISTORY:**
Mr. Gipson stated that as a child, he and his friend, Matthew, showed each other their genitalia periodically and engaged in some touching. He noted he was probably 6 or 7 at the time, and it did not seem unnatural when Matthew initiated it. He said his mother tutored children from one family, and while he was in the basement with them one day, they started to "play doctor." He left and went back upstairs. He stated he never got into trouble for making sexual comments or gestures growing up. He did not encounter pornography in either of his homes. He shared that while his mother was modest, she was a single mom and he did see her unclothed at times. He recalled no sexual jokes or discussions between adults occurring in his presence. He described his father's house as "more reserved" when it came to sex and it seemed like a serious topic. He was more open with his mother, and when he lost his virginity, he told her about it and noted his concern that she was pregnant. He said his mother created a safe sexual environment, particularly in contrast to his experiences at his father's house. He stated he might have learned the facts about sex through pornography or trial and error. He said he did not have an overt talk with his parents and did not receive strong messages that sex was shameful or should be reserved for marriage. He estimated he first masturbated around the age of 10 or 11, after his brother performed a sexual act on him first. He then repeated the act alone at his mother's house. He stated there were periods of time in which he was addicted to pornography and shared that in middle school, he had a routine. Namely, he would come home from school, go to the bathroom to watch pornography, and masturbate. On weekends, he said he would masturbate during any free time he had. He first had consensual sexual intercourse at the age of 13, when he dated Molly. He recalled it was new to both of them, but they had a close bond and wanted to try it. He stated he had sex regularly after that point. He said he was mostly satisfied with his sexual experiences, though he could not ejaculate unless he was doing part of the work. He stated he has never climaxed through the act of a partner alone, and he has always needed to do it himself. He acknowledged this could be, at least in part, due this history of abuse and his desire for control in sexual situations.

Mr. Gipson has no history of voyeurism or exhibitionism. He engaged in occasional sadomasochism with his high school girlfriend, Haley, and with Monica. He reported no history of fetishes. He has never attended a "gentlemen's club" or paid for sexual activity. He has never been accused of sexual harassment. He acknowledged that in all of his relationships, he has been

the one to initiate talking about sex. If his partners were interested and consented, he tried to guide them or teach them. He noted he would not push them to have sex, though he was open with his partners about his belief that sex is an important part of relationships. He reported no history of coercion and noted he would not engage in sexual activity if his partner had been drinking. He acknowledged that while he does experience occasional attraction toward men, he is mostly attracted to women. He reported no history of being attracted to minors in person and has never assumed roles wherein he has regular access to children or served as a mentor.

**BEHAVIORAL OBSERVATIONS AND MENTAL STATUS EXAMINATION:**
Mr. Gipson cooperated fully in the evaluation. He was brought to the visitation room by correctional officers without incident. He was dressed in an orange uniform and wore slides on his feet. He stated that he understood the purpose of the evaluation and the limits of confidentiality that were discussed with him. He appeared to understand all questions asked of him and responded accordingly. He developed an appropriate rapport with the examiner and related in a sincere and open manner.  He appeared to be a reliable informant, as he gave a detailed account of his sexual history that included socially disapproved behavior. He was somewhat guarded when discussing the extent of his trauma. He appeared to lack insight into the impact of the childhood sexual abuse he experienced, though this is not unusual considering he never received psychotherapy. He seemed protective of his parents and their lack of action after the abuse came to light, though he verbally acknowledged feeling angry at times and wishing things had been done differently. He was minimally distracted and displayed no unusual behavior or mannerism in the long assessment session.

Mr. Gipson was oriented x4. His thoughts were logical, consistent and coherent.  There was no evidence of loose associations, tangentiality, circumstantiality, push of speech, grandiosity, religiosity, delusions, hallucinations, or other thought disturbances. His memory for recent events was mostly intact, though he had difficulty recalling parts of his childhood. His affect was congruent to content, and he was tearful at times. He appeared slightly anxious initially, though he was more comfortable as the evaluation progressed. He spoke clearly in a normal rate and tone. His thought content was negative for suicidal and homicidal ideation. He displayed sufficient motivation and stress tolerance to complete the long testing session.

**CURRENT FUNCTIONING:**
Mr. Gipson stated he has been sleeping "a lot" in the past few weeks and shared that he is always tired. He noted a loss of interest in things, low mood, and withdrawal. He reported no recent changes in appetite, though he said having three meals a day is more than he is used to eating. He noted he has gained approximately 15-20 pounds since he has been incarcerated. He stated he worries quite often about the time he will miss with his family. He also worries about what prison will be like for him and what the future holds for him after that. He endorsed symptoms such as racing thoughts, increased heart rate, and tension.

Mr. Gipson said that sometime in high school, he realized that he should not be looking at child exploitative material. He stated he was aware of the potential consequences, though he did not think anything would happen to him. At some point, he did begin thinking about the minors in the videos, but he did not connect that it was abuse until Monica shared this with him after his arrest. He then did research on the impact to victims and the revictimization that occurs every

8

time someone views the video. After he and Monica separated, he experienced a significant depressive episode and stated he seemed to forget all he learned. He expressed great remorse and said he wishes he would have had other coping mechanisms. Mr. Gipson was tearful as he spoke about his daughter, who will grow up without her father. He indicated he thinks about the impact of this "all of the time" and expressed sadness. In terms of future plans, Mr. Gipson said he thought he would work at Walker for a long time. Now, he realizes that with the type of charges he has, it will be hard for him to resume a job that is tech driven and requires him to be on a computer. He said he is uncertain about how he might support himself in the future but shared he did assembly work at DEMA. He noted there is a science aspect to that work, so he may be able to find a job there or at a similar location that he might enjoy. When asked about his strengths, Mr. Gipson said he is empathetic, reflective, and compassionate. He shared his beliefs that others see him as an intelligent and kind person.

**PSYCHOLOGICAL TEST RESULTS:**
The **Wellness Assessment** is a brief self-report measure of common symptoms and problems. The measure includes a list of eleven recent problematic symptoms and asks the participant to rate the level to which these symptoms cause distress. The instrument also poses questions related to their self-views, ability to manage their problems, level of support, health, and substance use. Mr. Gipson indicated two of the eleven problematic symptoms bother him "somewhat." These symptoms include: "nervousness or shakiness;" or "feeling everything is an effort." He reported being "a little bothered" by "feeling no interest in things" and "heart pounding and racing." Mr. Gipson said he is "not at all bothered by" "feeling sad or blue;" "feeling hopeless about the future;"  "trouble sleeping;" "feeling fearful and afraid;" "difficulty at home;" "difficulty at work or school;" and "difficulty socially."

He strongly agreed with the statement that he has friends or family he can count on for help. He also strongly agreed with the statements "I can deal with my problems" and "I am able to accomplish the things I want." He agreed with the statement "I feel good about myself." He rated his overall level of health as good and reported no major medical concerns. His overall results indicate he was not attempting to magnify his complaints. However, based upon the information Mr. Gipson shared in his interview, his current legal issues, and the results of other assessment measures given, he may be minimizing his concerns.

On the **Adverse Childhood Experience (ACE) Questionnaire**, Mr. Gipson checked three of the ten items of negative experiences that might have happened to him in childhood. Individuals who check four or more adverse experiences on the questionnaire tend to have many more problems in adulthood with addiction, physical health, or emotional wellbeing. While it appears Mr. Gipson has limited exposure to developmental trauma, he experienced chronic abuse that was never truly addressed. While his ACE score suggests he is not at an elevated risk for adjustment problems in adulthood as a result of past traumatic experiences, it is likely Mr. Gipson has been greatly impacted by his experiences. He likely has more difficulty handling and adjusting to life stressors than individuals who have not experienced a high level of developmental childhood trauma.

The **Kaufman Brief Intelligence Scale -2R** is a measure of intellectual functioning. Mr. Gipson obtained an estimated IQ score of 120, placing his overall level of intellectual functioning within

the "above average" range, equivalent to the 90th percentile of adults in his age group. This score is consistent with his educational attainment, as he was able to complete his high school degree and complete some college. When he left college, he was able to find a job in the science/technology field and performed well. His score indicates sufficient measured intelligence to profit from any psychotherapy or sex offender treatment he might undertake.

The **Personality Assessment Inventory** (PAI) is a 344 item, multi-scale inventory for use in the clinical assessment of adults. The test produces scores on 22 discrete scales: 4 validity scales, 11 clinical scales, 5 treatment scales, and 2 interpersonal scales. The validity scales assess for inaccuracies in and distortions of responding attributable to Inconsistency, Infrequency, Negative Impression, and Positive Impression. The clinical scales assess Somatic Complaints, Anxiety, Anxiety-Related Disorders, Depression, Mania, Paranoia, Schizophrenia, Borderline Features, Antisocial Features, Alcohol Problems, and Drug Problems.

The PAI provides a number of validity indices that are designed to provide an assessment of factors that could distort the results of testing. Such factors could include failure to complete test items properly, carelessness, reading difficulties, confusion, exaggeration, malingering, or defensiveness. For this protocol, the number of uncompleted items is within acceptable limits. Also evaluated is the extent to which Mr. Gipson attended appropriately and responded consistently to the content of test items. His scores indicate he appropriately attended to items and responded to items in a consistent fashion. Additionally, Mr. Gipson did not attempt to present himself in an overly positive or overly negative light.

The PAI clinical profile reveals no marked elevations that should be considered to indicate the presence of clinical psychopathology. Scores on one or more scales do, however, show moderate elevations that may reflect sources of difficulty for Mr. Gipson. These problem areas may be related to current stressors or complicated life circumstances. These potential problem areas are described as follows. Mr. Gipson's report suggests that he is likely to be worried and concerned about some current issues to the degree that his ability to concentrate and attend are significantly compromised. Acquaintances are likely to comment about his overconcern regarding issues and events over which he has no control. He indicates that he occasionally experiences, or may experience to a mild degree, maladaptive behavior patterns aimed at controlling anxiety. Mr. Gipson indicates that he is uncertain and indecisive about many major life issues and has little sense of direction or purpose in his life as it currently stands. According to Mr. Gipson's self-report, he describes NO significant problems in the following areas: unusual thoughts or peculiar experiences; antisocial behavior; problems with empathy; undue suspiciousness or hostility; unhappiness and depression; unusually elevated mood or heightened activity; or difficulties with health/physical functioning.

In regards to self-concept, Mr. Gipson appears to involve a generally positive self-evaluation. He is generally a confident, resilient, and optimistic person, although his self-esteem may be reactive to changes in his current circumstances. During times of stress, he may inwardly be troubled by more self-doubt and misgivings about his adequacy than is readily apparent to others. Reactive changes in self-esteem may be accompanied by uncertainty about goals, values, and important life decisions.

Mr. Gipson's interpersonal style seems best characterized as one of autonomy and balance. With both interpersonal scales scoring in the average range, his assertiveness, friendliness, and concern for others is typical for that of normal adults.

Mr. Gipson's responses indicate that he is likely to be experiencing a mild degree of stress as a result of difficulties in some major life areas. He reports that he has a number of supportive relationships that may serve as some buffer against the effects of this stress. His current level of distress appears to be related to these situational stressors, and the relatively intact social support system is a favorable prognostic sign for future adjustment.

Treatment considerations involve issues that can be important elements in case management and treatment planning. There is nothing to suggest Mr. Gipson is an imminent threat to his own safety, as he reports no suicidal ideation or thoughts of self-harm. Mr. Gipson describes himself as a very meek and unassertive person who has difficulty standing up for himself, even when assertiveness is warranted. Thus, he may have some difficulty in the appropriate expression of anger. Finally, his interest in and motivation for treatment is typical of individuals being seen in treatment settings, and he appears more motivated for treatment than adults who are not being seen in therapeutic settings. His responses suggest an acknowledgement of important problems and the perception of a need for help in dealing with these problems. He reports a positive attitude towards the possibility of personal change, the value of therapy, and the importance of personal responsibility. In addition, he reports a number of other strengths that are positive indications for a relatively smooth treatment process and a reasonably good prognosis.

**SEXUAL RISK ASSESSMENT:**
The **Static-99R** is an empirically tested risk tool designed to evaluate the risk of sexual offense recidivism based on available demographic and criminal history information. The Static-99R contains 10 items which are individually scored and added together for an aggregate score. The Static-99R has moderate accuracy in ranking individuals to their relative risk for sexual offense recidivism. The ability of Static-99R to assess relative risk has been consistent across a wide variety of samples, countries, and unique settings. Mr. Gipson's Static-99R score was calculated based on the records supplied by his attorney.

The first item on the Static-99R relates to age at release after arrest. As with all criminal offenses, the likelihood of an individual committing a sexual offense decreases with age. Mr. Gipson was in the 18-34.9 age range in March of 2023, and is therefore given a score of 1 on this item. Research also indicates that prolonged intimate connections may be a protective factor, and individuals who have lived with a partner for more than 2 years, as in Mr. Gipson's case, are given a score of 0 on this item. The third factor relates to the presence of non-sexual violence convictions related to the index offense. Engagement in non-sexual violence predicts the seriousness of potential harm should someone reoffend and is strongly indicative of overt violence. Mr. Gipson has no history of non-sexual violence in general and therefore is given a score of 0 on the fourth factor factor. The fifth item on the Static-99R is prior sexual offenses. Mr. Gipson was arrested for possession of child pornography prior to his federal charges and is therefore given a score of 1 on this item. Mr. Gipson received a score of 0 on items six and seven, as he does not have a history of multiple prior sentencing dates and he has no history of convictions of non-contact sexual offenses.

11

The final three items of the Static-99R relate to victims. Research has identified certain victim characteristics to be indicative of a higher risk for recidivism. While these items are not typically scored when the index crime involves CSEM, Mr. Gipson's offense involved production of online sexual content, with his daughter being the direct victim. Item eight on the Static-99R is scored positively only if the victim is unrelated. Thus, his score is 0 on this factor. The ninth factor relates to stranger victims. Because Mr. Gipson's offense involved someone he knew, he is given a score of 0 on this factor. Finally, the tenth factor considers whether or not there are any male victims. Mr. Gipson's offense did not involve a male victim, and he is given a score of 0 on this item.

Mr. Gipson score of 2 falls within the Moderate-Low Risk range. Offenders with this same score from the routine samples have been found to sexually recidivate at a rate of 3.4 - 7.4% after 5 years.

**SUMMARY AND CONCLUSIONS:**
Mr. Gipson is a 23-year-old man who was referred for a psychosexual evaluation. He pled guilty to charges related to production of child pornography. He presented as a sincere individual who acknowledged his behavior and took responsibility for his actions. The psychological testing showed evidence of anxiety and depression, both of which began at a young age. Mr. Gipson was also the victim of sexual, physical, and emotional abuse as a child, all of which occurred over the course of several years. The duration and severity of the abuse warranted significant psychological treatment, though Mr. Gipson's parents failed to connect him to supportive services after the abuse was revealed. Also, his stepbrother appeared to receive little to no consequences for his actions, which also negatively impacted Mr. Gipson. In addition to his own early mental health concerns, Mr. Gipson's mother experienced depressive episodes that impaired her functioning. Mr. Gipson, as her only child, engaged in caretaking behaviors and took it upon himself to help his mother meet friends and become socially active. After the abuse at his father's house was discovered, Mr. Gipson was cut-off from living with his father and remained with his mother full-time. While he stated he and his father saw each other and engaged in activities, their time together was limited. Some of Mr. Gipson's emotional and safety needs were not attended to during his childhood and he was left to navigate his complex thoughts and emotions on his own.. Mr. Gipson's pornography addiction likely developed as a way to escape his reality, feel more powerful as a person, and connect to others. Although Mr. Gipson articulated his occasional anger and disappointment regarding how the abuse was handled, he seemed protective of his parents and likely minimized the true impact of his childhood trauma. He appeared to have little insight into how his brother's abuse and his parents' subsequent inaction contributed to his sexual difficulties and the development of maladaptive coping strategies.

Mr. Gipson appears to be a passive, non-confrontational person, and there are no major signs of antisocial behavior/beliefs or pathological personality characteristics.  His profile is not characteristic of individuals who manipulate others, take advantage of others, or who lack a conscience regarding their behavior. It is unlikely he would intentionally or purposefully plan to harm anyone. Rather, Mr. Gipson was likely driven by problematic sexual experiences early in life that were the direct result of abuse. And, because this abuse was never addressed therapeutically, Mr. Gipson was left to navigate the impact of that trauma on his own. He developed maladaptive coping strategies and problematic beliefs about sex and sexuality as a

result. With proper treatment, such as trauma-informed psychotherapy, Mr. Gipson may be able to correct these unhelpful beliefs and behaviors. Additionally, Mr. Gipson did not attend sex offender treatment after his first arrest. Had he received treatment then, he may have developed a deeper understanding of the function of his pornography addiction and the harm CSEM causes to victims. Mr. Gipson acknowledged that treatment was needed and may have helped him make better choices. He did not have the resiliency necessary to cope with his long-term relationship ending as the result of his poor choices. He reverted back to problematic behaviors and began using other unhelpful coping strategies, such as abusing marijuana. As he reconnected to others interested in CSEM online, he began to feel like he was a part of something. He was in a vulnerable state when he learned about producing CSEM, and the idea of having power and control was likely appealing. Mr. Gipson appears to have some insight into this process and expressed a desire to engage in therapy and treatment in the future. He said he hopes there are programs he can be involved in wherever he lands after sentencing. Cognitive Behavioral treatment is recommended to assist Mr. Gipson in restructuring unhelpful thought patterns and learning new, healthy ways to cope. In terms of strengths, Mr. Gipson has strong support from his family. He is intelligent and hard-working, particularly if he is interested in what he is doing. He is also motivated to learn from his mistakes and become a better person in the future. He is personally engaging and is capable of developing a support network while incarcerated, as he has already done at his current facility. These factors support a positive prognosis for future adjustment.

Thank you for the opportunity to assist in this matter. Please do not hesitate to contact me with any further questions or concerns.

*/s/ Stephanie Bono, JD, PhD*
Stephanie Bono-Vice, J.D., Ph.D.
Licensed Psychologist – Missouri and Illinois
Illinois License # 071.011092
Expires 09/30/2024
Missouri License # 2019045098
Expires 01/31/2026